Hollywood Plays, Inc., et al., Respondents, *v.* Columbia Pictures Corporation, Appellant.

Argued January 10, 1949; decided April 14, 1949.

62

*Louis D. Frohlich* and *Arthur Karger* for appellant. I. Defendant was as a matter of law warranted in refusing to consummate the sale because of defects in plaintiffs' chain of title. The title offered to defendant by plaintiffs was not one that was free from reasonable doubt in respect to the rights acquired in Woods' bankruptcy proceedings. (*Matter of Gerstenzang,* 5 F. Supp. 904; *Thayer* v. *Finton,* 108 N. Y. 394; *Fitzpatrick* v. *Sweeny,* 56 Hun 159, 121 N. Y. 707; *Coleman* v. *Manhattan Beach Improvement Co.,* 94 N. Y. 229; *McPherson* v. *Schade,* 149 N. Y. 16; *Crocker Point Assn.* v. *Gouraud,* 224 N. Y. 343; *Irving* v. *Campbell,* 121 N. Y. 353; *Murray Co.* v. *Lidgerwood Mfg. Co.,* 241 N. Y. 455.) II. Defendant was not required to accept a title as to which there was a reasonable doubt. (*Vought* v. *Williams,* 120 N. Y. 253; *Brokaw* v. *Duffy,* 165 N. Y. 391; *Lynbrook Gardens* v. *Ullmann,* 291 N. Y. 472; *People* v. *Open Board of Stock Brokers Bldg. Co.,* 92 N. Y. 98; *Wallach* v. *Riverside Bank,* 206 N. Y. 434; *Harris* v. *Moskowitz,* 236 App. Div. 196, 261 N. Y. 605; *Van Vliet & Place* v. *Gaines,* 249 N. Y. 106; *Isaacs* v. *Schmuck,* 245 N. Y. 77.) III. A prior unrecorded assignment of all but 25% of Woods' interest in the stage rights to the play would be valid for the additional reason that it would not conflict with the subsequently executed bill of sale specifying only a 25% interest. Recording acts such as that here involved afford protection only as against a prior unrecorded assignment of *the same rights or interests* as are subsequently conveyed by the recorded assignment; and it has been held that the prior assignment will be given effect, though unrecorded, where that can be done without defeating the subsequent recorded assignment. (*Brown* v. *Jackson,* 3 Wheat. [U. S.] 449; *Turnbull* v. *Weir Plow Co.,* 6 Biss. 225, 14 F. 108; 2 Walker on Patents [1937 ed., Deller], p. 1414.) IV. Nor is there any evidence that plaintiffs made any diligent inquiry, of Woods or through other sources, to ascertain whether Woods actually owned more than the specified 25% interest at the time of his bankruptcy or whether he had made any pre-bankruptcy assignment. (*Auburn Button Co.* v. *Sylvester,* 72 Hun 498, 147 N. Y. 714.) V. The United States Copyright Act obviously has no extraterritorial force; and the recording requirement of that act is a limitation only on copyright protection in this country, and could have no effect on the stage or

dramatic rights in other countries. (*United Dictionary Co.* v. *Merriam Co.*, 208 U. S. 260; *Ferris* v. *Frohman*, 223 U. S. 424; *Dowagiac Mfg. Co.* v. *Minnesota Moline Plow Co.*, 235 U. S. 641; *American Code Co.* v. *Bensinger*, 282 F. 829.)

*Abraham Shamos, Rudolph E. Uhlman* and *Norman Hammer* for respondents. I. Whether the minds of the parties met in an agreement is a question of fact which the courts below have resolved in favor of plaintiffs. Since that decision rests upon substantial evidence, it is not open for further review. (*Orr* v. *Doubleday, Page & Co.*, 223 N. Y. 334; *1240 Third Ave.* v. *Birns*, 232 App. Div. 522; *Wise & Co.* v. *Wecoline Products*, 286 N. Y. 365.) II. Defendant's refusal to complete the purchase of the motion-picture rights was not justified upon any of the grounds set forth in its letter of refusal. (*Littlejohn* v. *Shaw*, 159 N. Y. 188; *Norwegian Evangelical Free Church* v. *Milhauser*, 252 N. Y. 186; *Whittier Estates* v. *Manhattan Sav. Bank*, 181 Misc. 662, 268 App. Div. 1037; *Hanbury* v. *Metropolitan Securities Co.*, 215 App. Div. 225; Bankruptcy Act, § 70, subd. [a]; U. S. Code, tit. 11, § 110, subd. [a]; *Gross* v. *Irving Trust Co.*, 289 U. S. 342; *First Nat. Bank of Jacksboro* v. *Lasater*, 196 U. S. 115; *Stephan* v. *Merchants Collateral Corp.*, 256 N. Y. 418; *Matter of Burr Mfg. & Supply Co.*, 217 F. 16; *Gorman* v. *La Bella*, 146 Misc. 408; *Matter of Central Park Dairyland*, 179 Misc. 611.)

Fuld, J. " Ladies' Night ", under various titles, had been a hit on the stage, and in 1943, Columbia Pictures Corporation negotiated with plaintiffs for the motion-picture, television and radio rights to the play. A purchase price of $150,000 was agreed upon. Telegrams were exchanged embodying terms of the deal, but before a formal contract was drawn, defendant, claiming that plaintiffs' title to the motion-picture rights was defective, refused to proceed further.

Some time later, plaintiffs instituted this action for breach of the alleged contract. They have thus far prevailed, a judgment for $50,000 rendered in their favor in the trial court having been affirmed by the Appellate Division. There was a dissent upon the ground that approval by an organization known as the Dramatists' Guild, in the opinion of the dissenting Justice a necessary prerequisite to the creation of a contract, had

not been obtained. The view which we take — that defendant was excused from performance because of a defect in plaintiffs' title — requires reversal without more and renders unnecessary consideration of any question bearing upon the validity and the binding effect of the alleged contract.

By the telegraphic exchanges, plaintiffs had bound themselves to deliver the complete " world motion picture rights " and " world talking motion picture rights " to " Ladies' Night " and defendant was, of course, entitled to no less. A purchaser or one who undertakes to buy will not be compelled to abide by his promise if the seller proffers a title which is prey to doubts and challenges, which threatens to involve the buyer in costly litigation. (See, e.g., *Lynbrook Gardens* v. *Ullmann*, 291 N. Y. 472, 477; *Van Vliet & Place* v. *Gaines*, 249 N. Y. 106, 110; *Brokaw* v. *Duffy*, 165 N. Y. 391, 399; *Heller* v. *Cohen*, 154 N. Y. 299, 306; *Vought* v. *Williams*, 120 N. Y. 253, 257.) To render a title doubtful, it is not necessary that it in fact be bad or that bitter experience has stamped it so; it is enough if the title be uncertain, clouded by apparent defects or subject to reasonable misgivings. (See, e.g., *Brokaw* v. *Duffy*, 165 N. Y. 391, 399, *supra; Heller* v. *Cohen*, 154 N. Y. 299, 306, *supra; Vought* v. *Williams*, 120 N. Y. 253, 257, *supra*.) " A purchaser ", this court wrote in the *Vought* case " is not to be compelled to take property the possession of which he may be compelled to defend by litigation " (120 N. Y., *supra*, at p. 257). And in the *Brokaw* case, we likewise pointed out that " ' The title tendered need not in fact be bad ' " in order to relieve the purchaser from his obligation; if the title is " ' so clouded by apparent defects, either in the record or by proof outside of the record, that prudent men, knowing the facts, would hesitate to take it ' ", the purchaser is excused from performing (165 N. Y., *supra*, at p. 399).

In the light of this principle, consideration of the record is persuasive that plaintiffs' title was so uncertain " ' that prudent men * * * would hesitate to take it ' ", and that conclusion is rendered the more certain when we bear in mind that defendant would have had to invest about a million dollars to complete its venture, to screen and produce the picture, after it had paid $150,000 as the purchase price.

Plaintiffs, of course, insist that they do possess 100% of the motion-picture rights and that they can deliver these rights to defendant as they promised. It is undenied that 50% of plaintiffs' rights derive from A. H. Woods, through his trustee in bankruptcy. The dispute focuses upon the issue of whether plaintiffs ever acquired a clear and unclouded title to that 50% interest, and, accordingly, we address ourselves to that narrow question.

The record reveals that, through contracts with the author Charlton Andrews and the playwright Avery Hopwood, Woods obtained the exclusive stage rights to a revised version of the play, and, in addition, to 50% of the motion-picture rights. There seems little question that Woods retained that 50% interest until as late as 1929. In 1931, however, he filed a petition in bankruptcy, and, in connection therewith, listed all the assets available to creditors. Schedule B-2, annexed to the petition, carried a listing of his interests in " SILENT AND TALKING MOTION PICTURE RIGHTS " and of his holdings in " RELEASES FOR STOCK PRODUCTION ". To each page of that schedule he affixed his name, and over his signature, in meticulous detail, he documented to the fraction and to the decimal his per centum interests in each of the plays which he owned. Coming to " LADIES' NIGHT ", Woods described his share in the " talking motion picture rights " as 25%, and his interest in " releases for stock productions " as 50%. Those identical percentages were listed as his holdings in the bill of sale thereafter executed by Irving Trust Company as trustee in bankruptcy; once again, most significantly, his interest in the " talking motion picture rights " was given as 25%.

Thus, it is indisputable that the essential documents, those to which plaintiffs trace — indeed, must perforce trace — their claim of ownership, indicate that Woods and his trustee in bankruptcy had but a 25% interest in the " talking motion picture rights " to " Ladies' Night ". There is no gainsaying the fact that those documents in no wise accounted for or explained the whereabouts of the remaining 25% interest in those rights. What happened to that missing 25% we do not know. It is impossible to shrug off, as mere clerical error or inconsequential oversight, this disparity in the figures listed with equal exactitude by the bankrupt and his trustee. It is not unreasonable

to conclude that Woods had, between 1929 and his bankruptcy in 1931, sold or otherwise disposed of that vital 25% share.

Though it may be true, as plaintiffs urge, that all of the bankrupt's assets passed to his trustee and that the trustee, in turn, intended to transfer all of Woods' interests to the purchaser at the bankruptcy sale, that leaves unanswered the question to be decided, namely, the interest which Woods actually owned at that time. Was it 50% or 25%? In the light of the detail and precision employed in enumerating his interests, Woods' description of his "talking motion picture rights" in "Ladies' Night" as 25% rather than the asserted 50%, would strongly suggest that he knew and understood the exact extent of his interest in that play and that he intended to give and was able to give only 25%. If that be so, the trustee in bankruptcy obviously could give no more than that 25%, despite the fact that in its bill of sale it had conveyed "all" of Woods' rights.

It was, as indicated, at the bankruptcy sale that plaintiffs acquired their interest. Consequently, if the 25% specified in Woods' petition and in the trustee's bill of sale was the extent of Woods' interest and if it was the interest which the purchaser acquired, plaintiffs obviously did not procure and were not able to convey a complete or valid title. And, as bearing upon the matter, when one of the plaintiffs, Hopwood Plays, Inc., conveyed its interests to another, Hollywood Plays, Inc., the grant was only as to "plays and assets * * * more particularly set forth and enumerated in * * * the [trustee's] Bill of Sale".

On the other hand, even if Woods actually owned a 50% interest when he became a bankrupt, even if the recitals in his schedule and in the trustee's bill of sale were merely mathematical errors, the title, so far as defendant was concerned, still remained defective. For example, Woods or one of his creditors was free to petition the bankruptcy court at any time to reopen the estate for the purpose of administering the previously undisclosed and undistributed assets of the bankrupt. Although eleven years had intervened since the closing of the estate, a lapse of that time constitutes no bar to its reopening for that purpose. (See *Tuffy* v. *Nichols*, 120 F. 2d 906, certiorari denied 314 U. S. 660; *Matter of Mirsky*, 124 F. 2d 1017, certiorari denied 317 U. S. 638; *Matter of Graff*, 255 F. 241; cf. *Lyn-*

*brook Gardens* v. *Ullmann,* 291 N. Y. 472, *supra.*)  Dispute as to whether the bill of sale could have been amended is somewhat beside the point.  Until it was in fact modified to describe the interest sold as " 50% ", the instrument could not be varied collaterally, and defense of the title at the suit of a third party claimant would be a difficult, if not a hopeless, matter.  In any event, it was surely not defendant's burden to effect the amendment; that was a duty imposed upon the seller.  (See, e.g., *Heller* v. *Cohen,* 154 N. Y. 299, 310–311, *supra; Carey* v. *Keith, Inc.,* 250 N. Y. 216, 220.)

The circumstance that no one had come forward to claim any share in the talking motion-picture rights since the bankruptcy does not render the title to those rights less free from doubt.  Suffice it to observe that, although " Ladies' Night " had been staged in San Francisco and Chicago in 1942 and 1943, no such moving picture had been produced.  There was, then, no occasion for an adverse claimant of talking motion-picture rights to appear and dispute plaintiffs' title.

A practical problem calling for choice of action, not a theory, confronted defendant and its attorneys.  They might either have refused to go through with the transaction or they might have disregarded the palpable flaw in plaintiffs' title, accepted it, paid $150,000 for the play and invested another million dollars to screen and produce it.  To have pursued the latter course might well have jeopardized the entire investment.  As a practical common-sense matter, no businessman could reasonably be expected to invest so large a sum in a title that might at any moment have generated a lawsuit.  As a legal matter, no court should condemn the course which the defendant actually took.  Though there existed the possibility that the buyer's fears concerning plaintiffs' title might later have proved groundless, those fears certainly had substance, founded as they were upon reasonable doubts and uncertainties.  " A prudent purchaser may not be labelled as unduly cautious when he refuses such a title." (*Van Vliet & Place* v. *Gaines, supra,* 249 N. Y., at p. 110.)

In sum, even assuming that a contract had been effected, defendant, in declining to accept such title as plaintiffs could deliver, simply balked at buying a lawsuit.  That refusal was justified by the principle excusing nonacceptance where the purchaser reasonably believes that what he buys will involve

him in litigation. The real and substantial considerations to which we have called attention, not technicalities or ephemeral abstractions, move us to our conclusion.

The judgments should be reversed and the complaint dismissed, with costs in all courts.

DESMOND, J. (dissenting). Woods' whole interest in the play passed, automatically and by operation of law, and regardless of statements in the schedules, to Woods' trustee in bankruptcy (U. S. Code, tit. 11, § 110; see *Stephan* v. *Merchants Collateral Corp.*, 256 N. Y. 418, 422; *First Nat. Bank* v. *Lasater,* 196 U. S. 115, 119; *Gray* v. *Gudger,* 260 F. 931, 932). Thereafter the trustee sold and transferred that whole interest, formerly of Woods, to plaintiffs' predecessor, as appears without doubt from the trustee's notice of sale, his statements at the sale, the referee's order of confirmation and the trustee's bill of sale. Thus there can be no question here of any partial interest in this play being an unadministered asset of the Al Woods bankruptcy, or of any possible reopening of the estate hereafter, for disposal thereof. It is, therefore, clear beyond all doubt that the trustee got all Woods' rights and sold all those rights to plaintiffs' predecessor.

It follows that any defect in the bankruptcy vendee's title to the 50% could only have come about because Woods, between 1929, when he unquestionably owned 50%, and 1931, when he was adjudged bankrupt, somehow, in some manner, at some time and to some person undisclosed, transferred out a 25% interest. Whether or not he did so is in its essence a question of fact. As the sole suggested basis for an affirmative answer to that question, we have defendant's speculation or guess, with nothing to support it except the listing by Woods, in his bankruptcy schedules, of a 25% interest, not a 50% interest. As against that mere guess, there is the much more reasonable one that, in setting down his claimed ownerships in scores of plays — good, bad and indifferent — Woods just simply made a mistake as to the quantum of his rights in " Ladies' Night ".

But, what is more important, we have in this record, as against that guess that Woods somehow got rid of 25% before his bankruptcy, much more than a contrary guess. First, we have the fact that Woods owned 50% at least up to 1929. Second, we have the presumption that such ownership continued (*Chapman*

v. *Town of Taylor,* 136 N. Y. 663; *Cuyler* v. *Wallace,* 183 N. Y. 291; *Claris* v. *Richards,* 260 N. Y. 419, 423; *Matter of A. O. Brown & Co.,* 183 F. 861, 863). Third, we have the fact that Woods before the bankruptcy, and the bankruptcy sale vendee thereafter, were treated always as 50% owners, as to royalties, etc. Finally, we have the Trial Justice's remarks on this matter in his opinion, which remarks cannot be read other than as a finding that Woods' bankruptcy trustee had, and sold, a 50% interest; that finding was, by failure to find otherwise, affirmed by the Appellate Division, and the only opinion in that court (the Presiding Justice's dissent) did not even mention the matter. We cannot make a contrary finding.

A contract vendee should not be forced to take a doubtful title, but he cannot escape liability for nonperformance by erecting his vague and baseless speculations into substantial doubts. Even if this be no more than a matter of judgment — as to whether this supposed break in the title is real and important — then both courts below have given us their judgment that it is not.

The judgment should be affirmed, with costs. [See 299 N. Y. 683.]

LOUGHRAN, Ch. J., LEWIS and CONWAY, JJ., concur with FULD, J.; DESMOND, J., dissents in opinion in which DYE, J., concurs.

Judgments reversed, etc.