### LOEW'S Inc. v. WOLFF et al.
#### No. 10526–C.

United States District Court
S. D. California, Central Division.
Dec. 21, 1951.

Loeb & Loeb, Los Angeles, Cal., for plaintiff.

Morris E. Cohn, Beverly Hills, Cal., for defendant Erich Wolff.

Harold A. Fendler and Robert W. Lerner, Beverly Hills, Cal., for defendant Victoria Wolf.

Pacht, Tannenbaum & Ross, Beverly Hills, Cal., for Screen Writers Guild Inc., amicus curiae.

JAMES M. CARTER, District Judge.

This case raises novel questions concerning literary property; and warranties, express and implied, in the sale thereof. The case arises under the diversity jurisdiction of this court.

On March 21, 1949, defendants, Victoria Wolf and Erich Wolff, sold to the plaintiff, Loew's Inc., a story in manuscript form entitled, "Case History." On that date, a regular form contract used by plaintiff was executed by the defendants. The present action is based upon alleged violations of certain provisions of this contract.

The facts, as disclosed at the trial which led up to the execution of this contract, are as follows:

Erich Wolff, a doctor, specializing in cardialgy, had met his former wife, Cathy, during chemistry lectures where she was a laboratory assistant at the institute at which he studied.

Following their marriage, she later became subject to spells of extreme melancholia and attempted suicide. He investigated shock treatment and radium treatment for ovarian glands. Following her second suicide attempt, she submitted to radium treatment which produced a marked change in her personality. A third suicide attempt followed and she died on May 22, 1942.

A year and a half later, Doctor Wolff read articles in medical journals describing

a pre-frontal lobotomy operation for melancholia and the marked change it produced in a patient's personality. It will be noted that all of these matters, as testified to by Dr. Wolff, were factual matters and in the public domain.

Victoria Wolf, a short story writer and novelist met Erich Wolff in 1943. Late that year, he first discussed with her the operation on the brain, known as a prefrontal lobotomy, as the basis of a story. She knew, and Erich Wolff told her, of the tragic experiences of Wolff and his former wife. Wolff told her of the lobotomy operation; its cure of melancholia, and its transformation of the character of the patient. Due to other commitments, Victoria Wolf was unable to write the story for Erich Wolff at that time.

After his discussion with Victoria Wolf, he then contacted Elsie Foulstone, also a writer, and discussed the possibility of her aiding him in preparing a draft of the story for motion picture purposes. He told her of the facts above and she wrote a synopsis of a story entitled, "Swear Not by the Moon," based on those facts, plus additional fictional matter. The end product did not please Erich Wolff and he relieved her of any further duties.

Nothing further was done about the story until some time in 1945, when Erich Wolff again contacted Victoria Wolf and prevailed upon her to work on the story. In that year Victoria Wolf wrote a synopsis of a story entitled, "Through Narrow Streets," which was based upon the doctor's former wife's experiences, the doctor's description of a lobotomy operation and her own research concerning it, and additional fictional matter.

Dissatisfied, she next wrote a revision entitled, "Brain Storm" and late in 1948 or early 1949, wrote a second revision entitled, "Case History," the story in suit. It was a combination of fact and fiction.

As stated above, this story was sold to the plaintiff in March 1949 for $15,000.

The document executed by the parties was entitled "Assignment of All Rights." By its language, (Sec. 1) defendants Erich Wolff and Victoria Wolf transferred and sold to plaintiff all rights of every kind in and to the story and "the complete, unconditional and unencumbered title" thereto. Section 4 of the assignment provided that defendants represented and warranted that each was the "sole author and owner of said work, together with the title thereof,"[1] and "the sole owner of all rights of any and all kinds whatsoever in and to said work, throughout the world;" that each had "the sole and exclusive right to dispose of each and every right herein granted;" that "neither said work nor any part thereof is in the public domain;"[2] that "said work is original with me in all respects;" that "no incident therein contained and no part thereof is taken from or based upon any other literary or dramatic work or any photoplay, or in any way infringes upon the copyright or any other right of any individual, firm, person or corporation."

Section 5 provides for the appointment of the purchaser as lawful attorney, irrevocably, for the sole benefit of the purchaser to institute and prosecute any action to protect the rights granted herein.

By Section 6, the defendants guarantee and warrant that they will "indemnify, make good, and hold harmless the purchaser of, from and against any and all loss, damage, costs, charges, legal fees, recoveries, judgments, penalties, and expenses which may be obtained against, imposed upon or suffered by the purchaser by reason of any infringement or violation or alleged violation of any copyright or any other right of any person, firm or coporation, or by reason of or from any use which may be made of said work by the purchas-

---

1. Sec. 8 provides that if two or more persons appear as signatories to the assignment, the agreement shall bind them jointly and severally. No point has been made that each states, "I am the sole author and owner of said work."

2. This is an obviously fictitious provision and must have been so known by both parties. No story can exist without some matter, be it minute, from the public domain.

er, or by reason of any term, covenant, representation, or warranty herein contained, or by reason of anything whatsoever which might prejudice the securing to the purchaser of the full benefit of the rights herein granted and/or purported to be granted."

Section 7 provides that the sellers "agree duly to execute, acknowledge and deliver, and/or to procure the due execution, acknowledgment and delivery to the purchaser of any and all further assignments and/or other instruments which in the sole judgment and discretion of the purchaser may be deemed necessary or expedient to carry out or effectuate the purposes or intent of this present instrument."

About three months after the execution of this instrument and the sale, Elsie Foulstone discovered that Erich Wolff had sold his story, and on July 1, 1949, plaintiff was notified that she claimed a portion of the proceeds of the sale because of the work she had done in 1944. On that same day plaintiff notified defendants' agent of the Foulstone claim. On July 30, 1949, plaintiff made a demand on defendants that they obtain a quitclaim and release from Foulstone within a reasonable time or they would be compelled to rescind their agreement of March 21st. On September 21, 1949, Elsie Foulstone filed action in the Superior Court of the State of California, County of Los Angeles, naming Erich Wolff, Victoria Wolf and Metro-Goldwyn-Mayer Pictures as defendants. The present plaintiff was not served and did not appear. Both of the present defendants were served and appeared in the Superior Court action.

On September 30, 1949, the plaintiff served defendant Erich Wolff with a notice of rescission. On October 1, 1949, defendant, Victoria Wolf, was served with a like notice. On February 28, 1950, the Superior Court rendered a judgment in favor of defendants finding that Elsie Foulstone had no valid claim or interest in or to the story, "Case History" which was sold to the plaintiff. The present action was filed on November 2, 1949, prior to the above mentioned judgment.

Plaintiff's complaint contains seven causes of action, some of which may be promptly disposed of, while others raise new and novel questions concerning expressed and implied warranties concerning the sale of literary property.

Plaintiff's complaint contains the following causes of action:

First cause of action, alleges breaches of certain express promises and warranties, to-wit,

1. That defendants did not own the complete, unconditional and unencumbered title to the story.

2. That defendants were not the sole owners or authors of said story.

3. That defendants did not have sole or exclusive rights to said story.

4. That defendants caused the assigned rights to be impaired.

5. That the story was not original with defendants.

6. That the use of said story by the plaintiff would violate the rights of another person.

7. That "Case History" was copied in large part from another work.

Plaintiff alleges the right to rescind, and that it rescinded, and claims the return of the purchase price.

Second cause of action is based upon the express warranties of the first cause and the additional theory that defendants agreed to sell plaintiff a "marketable and perfect" title to the story, "Case History," free from reasonable doubt.

Third cause of action alleges failure of consideration because of the breach by defendants of the warranties set forth in the first and second causes.

Fourth cause of action alleges defendants fraudulently induced plaintiff to enter into said contract and plaintiff was therefore entitled to and did rescind said contract.

Fifth cause of action alleges that plaintiff entered into said contract under a mistake of fact, relying on the express warranty of the first cause and the theory of "perfect and marketable" title in the second cause.

Sixth cause of action alleges that under provision 6 of the contract defendants agreed to indemnify and hold harmless the plaintiff in any action for all costs, losses, etc., incurred by plaintiff by reason of any infringement or violation or alleged violation of the right of another person. This cause of action is for damages for the decrease in value of the story and for all costs and attorneys' fees involved in this action.

Seventh cause of action alleges fraudulent representations, to-wit the express warranties above, and claims money damages.

At the conclusion of the trial, the court found:—

1. That "Case History" was a different story from "Swear Not By the Moon", and that the only points of similarity were factual matters from the public domain.

2. That Erich Wolff collaborated with Elsie Foulstone on the story, "Swear Not By the Moon."

3. That there had been proved no fraud or fraudulent representations on the part of the defendants, Erich Wolff and Victoria Wolf.

■ The court now finds:—

1. That defendants owned the complete, unconditional and unencumbered title to the story, "Case History".

2. That defendants were the sole owners and authors of said story.

3. That defendants had the sole and exclusive rights to said story.

4. That defendants did not cause the rights assigned to be impaired.

5. That the story was original with defendants.

6. That the use of the story by plaintiff would not violate any rights of Miss Foulstone.

7. That there was no fraudulent concealment of material facts.

These findings dispose of causes of action one, four and seven.

The second cause of action, in addition to setting forth express warranties which we have found were not breached rests on plaintiff's claim to a "marketable and perfect" title, free from reasonable doubt. This raises the question of the existence and validity of what will hereafter be referred to as "implied warranties."

The third and fifth causes of action raise the same question, since they incorporate the allegations of the second cause.[3]

The sixth cause of action will depend upon the interpretation given to provision 6 of the "Assignment."

## I.

There Was No Warranty, Express or Implied, of "Marketable and Perfect Title" to the Story.

■ A. There was no express warranty.

The plaintiff argues that an express warranty of "marketable and perfect" title, free from reasonable doubt, arose by the use of the words, "complete, unconditional and unencumbered title"; "sole author and owner of said work"; "sole owner of all rights of any and all kinds whatsoever in and to said work, throughout the world"; and "I have the sole and exclusive right to dispose of each and every right herein granted." Nowhere in this most comprehensive instrument can be found the words "marketable, perfect or free

3. Causes of action two, three and five, although entitled "rescission" are really claims for money after an alleged rescission by the act of the plaintiff. This court is not asked to rescind the contract between the parties. The plaintiff contends that prior to the judgment of the Superior Court, it has rescinded and that this judgment in no way affected that rescission. Even though this court found that defendants owned the complete, unconditional and unencumbered title to the story, it does not mean that this court found defendants had a "perfect and marketable title, free from reasonable doubt," at the time of the sale or at the time of the attempted rescission by the plaintiff. If such a warranty existed, either expressly or by implication, then the rescission by plaintiff might have been effective. Our question then is, "Did such a warranty exist?"

from reasonable doubt." Thus, in order to find such an express warranty it must be found that the words actually used in the "Assignment of Rights" were or are synonymous with "marketable and perfect" title.

No case has been cited by counsel nor can any be found by this court which holds that the phrase "complete, unconditional and unencumbered title" is synonymous with "marketable and perfect" title. The common meaning of the word "complete" is "Filled up, with no part, item, or element lacking." It means that the "whole" title has been given and that no part or portion of it has been kept by the seller or sold to any other person. In two cases involving the sale of real estate, the words "complete title" were found to mean the instruments which constitute the evidence of title, and not to mean the estate or interest conveyed. Slidell v. Grandjean, 1883, 111 U.S. 412, 4 S.Ct. 475, 28 L.Ed. 321; Dingey v. Paxton, 60 Miss. 1038, at page 1054.

The warranty of "marketability of title" is a warranty found almost exclusively in connection with the sale of real property. Such words as "merchantable title," "clear title," "good title" and "perfect title" have been held in cases involving the sale of land to mean the same as "marketable title." Lund v. Emerson, Tex.Civ.App., 204 S.W. 2d 639, 641; O'Meara v. Saunders, Tex. Civ.App., 199 S.W.2d 689, 692; Silfvast v. Asplund, 93 Mont. 584, 20 P.2d 631; Northouse v. Torstenson, 146 Neb. 187, 19 N.W. 2d 34, 36; Johnson v. Malone, 252 Ala. 609, 42 So.2d 505, 509. None of these words can be found in the present instrument. As used in this assignment the word "complete" was not meant to be synonymous with the word "marketable or perfect." It was used to mean just what the word indicated, i. e. "whole title," that is, that no other person owned any interest in the property nor was any kept by the sellers. In this respect, the plaintiffs got what they bargained for. It seems evident that the remaining words used in the assignment are not synonymous with "marketable or perfect" title.

██ B. There was no implied warranty.

Plaintiff argues that the law implies the warranty of marketable title in the sale of literary property. In doing so, plaintiff wishes to have this court apply a well established doctrine used exclusively in the sale of real property to the sale of personal property. To support its contention, plaintiff cites the case of Hollywood Plays, Inc., v. Columbia Pictures Corp., 299 N.Y. 61, 85 N.E.2d 865, 10 A.L.R.2d 728. In this case, the plaintiffs sought damages for breach of a contract to purchase the motion picture, television, and radio rights to a play. The plaintiffs had purchased an interest in these rights from the trustee of one Woods, who had originally received 50 per cent of these rights by license from the proprietors of the copyright. In Woods' schedules in bankruptcy, he had listed his ownership as 25 per cent. There was no question but that Woods had owned 50 per cent up to two years before his adjudication in bankruptcy, and the plaintiffs contended that the insertion in his schedules of the lesser figure had been due to a mere error. No other explanation was forthcoming, and the plaintiffs relied on the fact that all of Woods' property had in fact, passed to his trustee, and had been included in the sale and assignment by the trustee to the plaintiffs. The New York court in reversing the lower courts, held that "the defendant was excused from performance because of a defect in plaintiffs' title." The court avoided the finding by the trial court that plaintiffs had actual title, and in our opinion erroneously declared the issue to be whether or not plaintiffs had an "unclouded title."

There are more than mere historical reasons for concluding that the doctrine of "marketable title" should be limited to cases involving the sale of real property. This doctrine has a basis in the traditional concepts of judicial fair play. Briefly, the doctrine developed because the courts at common law believed, and rightly so, that since the law required there be a recorded title in the sale of real estate, then that record title should be clear and free from reasonable doubt. A buyer, desiring to purchase the seller's land, would request that the seller deliver to him a "market-

able" record of title to the property. If by searching the record, the title was free from reasonable doubt, it was proclaimed that the buyer had a "marketable" title and could not avoid the enforcement of the contract. If on the other hand, a defect appeared in the record title, then the common law courts felt that justice demanded that the seller either clear the record title or they would allow the buyer to avoid the contract. But the doctrine was not applied to the sale of personal property. At common law and with few exceptions the law as it exists today, there was no requirement that the sale of personal property be recorded. The doctrine of caveat emptor therefore prevailed. Without the application of this latter doctrine, it is highly doubtful that any sale of personal property would ever become final. There are no records to search. There is no way to ascertain that a cloud exists on the title. It is not a requirement that a record title be produced before a purchaser will buy the article in question. Thus, because of these differences between the sale of real and personal property, the courts neither then nor now could imply by law into a contract of sale of personal property the doctrine of "marketable" title. If they did so, then there would be no case in which the seller could rest in ease, for if any third person asserted a claim to the property the courts would be compelled to avoid the contract between the parties. To do this would be to place upon the seller an unsurmountable burden, and would leave the door open to allow a discontented purchaser to avoid any contract involving the sale of personal property.

■ For these reasons, in adopting the Uniform Sales Act the warranty of "marketable" title was conspicuously excluded. The implied warranties of title are found in Section 1733 of the Civil Code of California. There it is declared that the only implied warranties of title are, (1) that the seller has the *"right"* to sell; (2) "that the buyer shall have and enjoy *quiet possession* of the goods as against any lawful claims existing at the time of the sale", and (3) "that the goods shall be free at the time of the sale from any charge or encumbrance in favor of any third person * * *". With these exceptions there are no other implied warranties of title in the sale of personal property and this court will not imply any others. De Witt v. Berry, 1890, 134 U.S. 306, 10 S.Ct. 536, 33 L.Ed. 896; El Zarape Tortilla Factory v. Plant Food Corp., 1949, 90 Cal. App.2d 336, 203 P.2d 13.

It is obvious that sales involving literary property are different in some respects from the sale of ordinary goods. The sale of literary property is more analogous to the sale of patents and patent rights. Both literary properties and patents are products of the mind, plus skill. Both utilize matters in the public domain. A review of patent cases confirms the position taken by this court.

In *Consumers' Gas Co.* v. *American Electric Construction Co.*, 3 Cir., 1892, 50 F. 778, 780, the action was by an electric construction company against a gas company to recover the price of installing an electric plant. The gas company set up by affidavit of defense that a certain patentee had threatened it with a claim for damages for infringement of patent rights if it used the machinery installed by the plaintiff, and that by such use the defendant would also be liable to another patentee. The court held that these facts were no defense, declaring: "A purchaser of property, who has had the full use and enjoyment of the same, and is in the undisturbed possession thereof, in the absence of fraud, cannot withhold the purchase price because a third person claims to have a superior title thereto, or an adverse right therein, and threatens to bring suit to enforce the same, or because of an alleged liability on the part of the purchaser to a patentee for an infringement of letters patent, by reason of the use of the property." This case was followed in The Electron, 2 Cir., 1896, 74 F. 689.

It has also been held that the vendee of patent rights cannot maintain, as against an action for the price, the defense that he rescinded because he had been notified by a third party that the patent was an infringement and that he would be held liable therefor. Geist v. Stier, 1890, 134

988

Pa. 216, 19 A. 505. In Tinsman v. Independent Harvester Co., 1917, 205 Ill.App. 239 it was held that the vendee must show the actual invalidity of the patent, or at least that he had been enjoined after reasonable defense, Herzog v. Heyman, 1897, 151 N.Y. 587, 45 N.E. 1127.

■ The rule has been well put in the case of Computing Scales Co. v. Long, 66 S.C. 379, 44 S.E. 963, 964, 65 L.R.A. 294. There the court said: "If, however, the vendor at the time of the sale knew of a valid outstanding title or incumbrance, and failed to give notice to the vendee, the element of fraud is introduced, and the vendee may rescind without waiting for actual loss to come to him. * * * But mere dispute about the title, or the contingency of future loss, does not warrant a rescission, and, where the buyer returns the goods, and refuses to pay the purchase money, it is incumbent on him to show that there is a valid adverse claim, from which loss to him would inevitably occur. * * The application of the rule may sometimes result in hardship, but to adopt any other would make it possible for a purchaser to escape from his contract upon any claim coming to his notice, however baseless or absurd it might be."

■■ The above rules should be even more strictly applied in the sale of literary property and no court should be led into the pitfall of the real estate rule. In Golding v. R. K. O. Pictures, Inc., 1950, 35 Cal. 2d 690, 710, 221 P.2d 95, Justice Schauer of the Supreme Court of California refers to the fact that there are approximately thirty-six basic plots in all writing. Consequently, assertions of similarity and of plagiarism are practically a concomitant of all story writing. To establish then, a rule permitting the purchaser of literary property to return the property and demand back the purchase price upon a mere assertion of similarity or plagiarism is to create a right without the support of reason or principle, the exercise of which would result in untold hardship. There can be no other conclusion but that the law will not imply a warranty of "marketable" title in the sale of literary property.

Since it is the opinion of this court that there was neither an express nor implied warranty of "marketability of title", the second cause of action is accordingly disposed of. Consequently, the third and fifth causes of action which are predicated upon there being a warranty of "marketable" title must likewise fail.

II.

Are Defendants Obligated to Reimburse Plaintiff for Any Expenses Incurred in This Suit Under Provision 6, of the "Assignment."

■ Plaintiff's sixth cause of action is predicated upon the theory that regardless of the outcome of the other causes of action, defendants have agreed, by virtue of provision 6 of the "Assignment of Rights" to "indemnify, make good and hold harmless the purchaser of, from and against any and all loss, damage, costs, charges, legal fees, recoveries, judgments, penalties and expenses which may be obtained against, imposed upon or suffered by the purchaser by reason of any infringement or violation or alleged violation of any copyright or any other right of any person, firm or corporation, or by reason of or from any use which may be made of said work by the purchaser, or by reason of the breach of any term, covenant, representation, or warranty herein contained, or by reason of anything whatsoever which might prejudice the securing to the purchaser of the full benefit of the rights herein granted and/or purported to be granted."

Plaintiff contends that by bringing this action they have incurred legal expenses and costs and that the story has become valueless because they have not used it according to their planned schedules, and that because of this loss and expense, defendants are liable under the above provision.

The answer to this contention lies in well established rules pertaining to the interpretation of contracts. The basic question is, "What was the intent of the parties"? Did defendants agree to reimburse

plaintiff for any action brought by plaintiff against defendants, or any loss which plaintiff might inadvisably cause itself to suffer? We think not. The more logical interpretation would be that defendants agreed to reimburse plaintiff in the event the plaintiff were forced to defend an action brought by some third party. The plaintiff here was notified of the action filed in the California Superior Court. They refused to come in as party defendants. They expended no money in the defense of that action and incurred no loss thereby.

The expenses and any other loss which plaintiff might have incurred by bringing this action are self-imposed, and defendants are not liable therefor.