**FIDATA TRUST COMPANY OF NEW YORK f/k/a Bradford Trust Company,**

v.

**FEDERAL DEPOSIT INSURANCE CORP., Defendant.**

No. 87 Civ. 3488 (VLB).

United States District Court, S.D. New York.

July 14, 1993.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

The defendant Federal Deposit Insurance Corporation ("FDIC") as receiver of the Franklin National Bank sold the fiduciary business of Franklin to Bradford Trust Company, which is now Fidata Trust Company of New York ("Fidata") and the plaintiff in this case.

As part of the transaction, FDIC indemnified Fidata against "any and all claims ... based directly or indirectly upon any action or inaction ... as fiduciary ... prior to the Bank Closing ... arising directly or indirectly from the failure of the Assuming Bank to seek to recover any damages .. or to take any other action to compensate for or remedy such action or inaction ..."

Paragraph 11 of the Indemnity Agreement provided that the agreement "and the rights and duties of the parties hereto shall not be assignable by either party hereto except with the prior consent of the other party incorpo-

rated in a duly authorized written instrument . . ."

Fidata intends to transfer its fiduciary business to another entity and seeks summary judgment defining FDIC's obligations and determining that the indemnity agreement can be carried over to its assignee. I deny the motion on the grounds that FDIC's obligations under agreements submitted to me do not extend to indemnifying any assignee of Fidata. Fidata has failed to submit proof of its entitlement to a declaration or other relief.

## II

Bank instability has been a significant and at times distressing problem since the foundation of the Republic. It is one of the primary duties of the central banking system in any country to sustain the solvency of financial institutions so as to provide stability necessary for the predictable conduct of business. This is also critical to the public welfare.

Unlike many other countries, the United States lacked a central banking system for most of its existence until 1913 when the Federal Reserve Act was enacted; until then private institutions were relied upon to pick up the slack when they recognized it as in their enlightened self-interest to do so. See H. Satterlee, *J. Pierpont Morgan* ch XI at 277–308 (1939); *Laws of the United States Relating to Currency, Finance and Banking From 1790 to 1896* (Dunbar ed 1897, reprinted 1969).[1]

When a major banking crisis occurred in 1933, the Reconstruction Finance Corporation which was created (47 Stat 5 [1932]) upon the recommendation of President Herbert Hoover as a specialized segment of the central banking system, made loans or loan commitments to troubled banks, enabling them to reopen. See J. Jones & E. Angly, *Fifty Billion Dollars* (1951).

The Federal Deposit Insurance Corporation was created thereafter in order to provide bank depositors with greater security for their money; it was not originally intended to replace the central banking system as the bulwark of liquidity and solvency. The Federal Reserve System performed that function in numerous instances until the massive bailouts of financial institutions of the 1980s.[2]

The primary responsibility for supporting weak financial institutions was transferred for the first time during the 1980s to FDIC and similar agencies, funded not through the central banking system but by insurance charges to the banking industry, supported if necessary by tax monies. See Lescher & Mace, "Financing the Bailout of the Thrift Crisis," 46 Bus. Law No. 2 at 507 (ABA Feb. 1991).[3]

One of the measures adopted by the FDIC and similar agencies to conserve their resources and to limit the duration of their function as receivers for insolvent banks was to seek to find buyers for the those banks. To that end agreements favorable to such buyers were frequently negotiated, embracing such indemnity provisions as that involved in the present case.

Such provisions encouraged buyers to purchase the troubled banks by protecting the buyers against claims of past (pre-purchase) misconduct or claims of failure to seek to rectify such misconduct. They were not intended to require the sellers, including FDIC, to protect buyers against risks in-

---

1. The initial attempt at a central banking system was the First Bank of the United States, created by 1 Stat. 191 (1791); see A. Hamilton, *Message to Congress on a National Bank*, in 3 Works of Alexander Hamilton (1950); A. Hamilton, *Draft of a Report on a National Bank*, in 7 Papers of Alexander Hamilton (Columbia Univ. Press 1963); Hurst, *Alexander Hamilton: Law Maker*, 78 Colum.L.Rev. 483 (1978); L. Hacker, *Alexander Hamilton* ch 8 at 143 (1957).

2. In the 1980s bailouts were arranged as well for nonfinancial institutions in instances when the financial structure was considered to be at risk. See generally Corrot & Gormans, "Squeezing Silver," 17 Litigation No 4 at 6 (ABA Summer 1991).

3. Use of insurance premiums or tax monies for such purposes within the banking structure leads to a net reduction of the currency supply available for business or consumer transactions. See J. Hallman, R. Porter & D. Small, *M2 Per Unit of Potential GNP as an Anchor for the Price Level*, Staff Study 157, Board of Governors, Federal Reserve System (Apr. 1989).

curred in connection with future transactions. Indeed, provisions providing such protection would not make economic or political sense.

Transfer or assignment of the indemnity arrangement between the FDIC and the purchaser of a troubled bank would, of course, expose the FDIC to dealing with a downstream assignee. Involved would be complex issues, such as whether assets in connection with which claims were made by the assignee under the indemnity arrangement originated in whole, or in part, or not at all, with the institution sold by the FDIC. This would entail such a risk of expensive and uncertain litigation that I decline to assume that a contract between the FDIC and a buyer of bank assets provides such downstream indemnity unless provision for such indemnity can be fairly implied from the language of the contract itself.

### III

An unequivocal statement that an agreement is "not ... assignable" operates to make any assignment ineffective. See *General Electric Credit Corp. v. Zerox,* 112 A.D.2d 30, 490 N.Y.S.2d 407 (4th Dept.1985); *Sullivan v. International Fidelity Ins Co,* 96 A.D.2d 555, 465 N.Y.S.2d 235 (2d Dept.1983); *Sacks v. Neptune Meter Co,* 144 Misc. 70, 258 N.Y.S. 254, 256, 263 (Sup.Ct.N.Y.Co.1932), *aff'd,* 238 A.D. 82, 263 N.Y.S. 462 (1st Dept. 1933); *Hollywood Plays v. Columbia Pictures Corp,* 77 N.Y.S.2d 568, 577 (Sup. Ct. N.Y.Co.1947), *aff'd* 274 App.Div. 912, 83 N.Y.S.2d 302 (1st Dept.1948), *rev'd on other grounds* 299 N.Y. 61, 85 N.E.2d 865. Even if an anti-assignment provision were deemed a mere covenant not to assign, it would be enforceable against an actual signatory of the agreement; in the agreement before me it is enforceable against Fidata.

### IV

A motion for summary judgment may challenge the party with the burden of proof to establish sufficient basis for its claim to show a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). In this instance Fidata, although the moving party, has the burden of proof and has failed to

pinpoint any specific indemnity payments now due or likely to become due to it under its agreements with FDIC.

Fidata's affidavits are sworn to by counsel rather than personnel able to swear to facts from direct personal knowledge. The affidavits are accompanied by exhibits which on their face do not show any liability on the part of FDIC, nor has Fidata attempted to explain in any of its papers how its exhibits establish such liability.

I suggest consideration of a stipulation dismissing this case without prejudice.

SO ORDERED.