Albert ETTORE, Appellant,

v.

PHILCO TELEVISION BROADCASTING CORPORATION, Clayton, Inc. & Chesebrough Manufacturing Company, Consolidated.

No. 11503.

United States Court of Appeals Third Circuit.

Argued April 5, 1955.

Decided Jan. 17, 1956.

Rehearing Denied March 3, 1956.

Harold E. Kohn, Philadelphia, Pa. (Aaron M. Fine, Dilworth, Paxson, Kalish & Green, Philadelphia, Pa., on the brief), for appellant.

Herbert A. Barton, Oscar Brown, Philadelphia, Pa. (Swartz, Campbell & Henry, Philadelphia, Pa., Godfrey Julian Jaffe, New York City, on the brief), for appellees.

Paul D. O'Brien, New York City (O'Brien, Driscoll & Raftery, Fennelly,

Eagan, Nagee & Lage, New York City, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., on the brief), for amici curiae.

Before BIGGS, Chief Judge, HASTIE, Circuit Judge, and WILLSON, District Judge.

BIGGS, Chief Judge.

On this appeal we find ourselves within that forest ruefully referred to by Judge Goodrich in Leverton v. Curtis Pub. Co., 3 Cir., 1951, 192 F.2d 974, 975. The forest in this case, however, is only four states deep.

The plaintiff, Ettore, met Joe Louis in a boxing contest or fight in Philadelphia in 1936 and was knocked down in the first and fourth rounds and out in the fifth. Motion pictures were taken of the contest with Ettore's knowledge and consent; indeed, he contracted to be paid 20% of all proceeds derived from the sale of the motion picture rights of the contest and actually did receive $500 or one-fifth of $2,500 paid to the promoter for the sale of motion picture rights at or about the time of the contest. The record does not indicate that Ettore received any other or further payment.

Some thirteen years later, in December 1949 and 1950, National Broadcasting Company, not named as a defendant,[1] through its network twice telecast the motion pictures of Ettore's contest with Louis as a part of a television series called "Greatest Fights of the Century." "Greatest Fights of the Century" was a commercial program sponsored by Chesebrough Manufacturing Company, Consolidated, to advertise nationally its "Vaseline Cream Hair Tonic." WPTZ, an independent station owned and operated by the defendant Philco but affiliated with the NBC network, twice televised the Ettore films in the Philadelphia area, apparently at the same times as the NBC New York telecasts.[2] It was stipulated that the WPTZ programs "could be viewed in Pennsylvania, New Jersey, Delaware and possibly in other states, under unusual atmospheric conditions." The stipulation reads: "[I]nsofar as the defendant, Chesebrough, was concerned, the program was also telecast in New York [City] and elsewhere." The stipulation further states that Ettore, if he testified, would give evidence that he had not sold his television rights in the contest, nor his television rights with regard to the films of the contest, and also that he had not consented to the telecasts. The defendants, however, take the position in the stipulation that no consent was required. Commercial television at the time of the contest was nonexistent.[3]

The third round contained in the motion picture films was cut from the telecasts, as were also the slow-motion pictures of Ettore's knockdowns in the first and fourth rounds. The stipulation states that Ettore, if called as a witness, would testify that the omitted third round was his best and that its omission caused his friends to deride him.[4]

1. Named as a defendant was "Clayton, Inc.," an advertising agency. The correct name of this defendant seems to have been "Cayton, Inc." It was not served with process.

2. Inherent in the stipulation is the inescapable inference that the NBC New York telecasts and the Pennsylvania WPTZ telecasts were simultaneous.

3. According to information received from the Federal Communications Commission the first commercial television license was granted to WNBT, now known as WRCA–TV, in New York City. The construction permit and license were issued on June 17, 1941, effective July 1, 1941.

The Encyclopedia of American History, Professor Richard B. Morris and Professor Henry Steele Commager, as Chief Consultant Editor, Harper & Brothers, 1953, states that: "Full commercial television was inaugurated in 1941."

4. It should be noted from the stipulation that Ettore apparently, at first at least, did not object to the telecasts, despite the fact that he was not compensated therefor; for he informed his friends that they should watch for the third round. Only after he had discovered

The court below viewed the films as originally taken including the omitted portions, and then as they were telecast.

Jurisdiction in this suit ·is based on diversity of citizenship. Philco and Chesebrough moved to dismiss under Rule 41(b), Fed.Rules Civ.Proc. 28 U.S. C., asserting thát on the facts and the law Ettore had shown no right to relief. The motion to dismiss was granted. See D.C.1954, 126 F.Supp. 143. The appeal at bar followed.

■ In a diversity case a United States district court must follow the conflict of laws rule of the state in which it sits. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Hartmann v. Time, Inc., 3 Cir., 1947, 166 F.2d 127, 138, 1 A. L.R.2d 370, certiorari denied, 1948, 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763; and Leverton v. Curtis Pub. Co., supra. The Pennsylvania rule is in accord· with the Restatement, Conflict of Laws, Section 378, and is that the law of the place of wrong determines whether a person has sustained a legal injury. The Pennsylvania law creates the so-called "points of impact" referred to hereinafter. Cf. Foley v. Pittsburgh-Des Moines Co., 1949, 363 Pa. 1, 9, 68 A.2d 517, 521. The court below therefore had to determine what were the wrongs suffered by Ettore, if any, and the places where they occurred. Ettore claims that he has been damaged "in his property rights, right of privacy, good name and reputation. * * *" In this case, paradoxically, before it can be determined whether Ettore has suffered damage, it must first be decided in what states the damage, if any, occurred.

■ Ettore's alleged injuries must have been either to his person or to his property. Assuming damage to his person, to his right of privacy, sometimes called "the right to be let alone," illustration "(1)" to Section 377, Restatement, Conflict of Laws, is of. aid to us. The illustration states that where "A, standing in State X, fires a gun and lodges a bullet in the body of B who is standing in State Y. The place of wrong is Y." Assuming damage to Ettore's property, illustration "(7)" to Section 377 is suggestive. It states: "A, broadcasting in State X, slanders B. B is well and favorably known in State Y and the broadcast is heard there by many persons conversant with B's good repute. The place of wrong is Y." The views expressed in these examples as to gunfire and defamation by radio accurately portray the Pennsylvania law, the law of the forum. They furnish helpful analogies here.

■ The task of determining in what states, if any, Ettore was injured, brings us back to the stipulation. When an involuntary dismissal has taken place under Rule 41(b), F.R.C.P., all facts supplied by the stipulation or coming upon the record from any other source and all reasonable inferences therefrom must be viewed·in the light most favorable to the plaintiff. But even in this favorable atmosphere, insofar as the telecasts by Philco are concerned, we must assume that Philco's telecasts could be heard and viewed only in Pennsylvania and in adjacent parts of New Jersey and Delaware.[5] We may not assume that there were "unusual atmospheric conditions" which would carry them into other states.

that the third round had been omitted did he claim damage's to his rights of privacy and property. This fact is one which should be considered on the issue of damages, if and when the court below · should come to this question on remand.

5. WPTZ's television station, as it was situated in Philadelphia in 1949 and 1950, was approximately 35 miles distant from the nearest point in Maryland. The record supplies no data which would permit either the court below or this court to make use of the "line-of-sight" test to determine the range of WPTZ's television programs.

An official communication from the Federal Communications Commission to :the present writer, dated January 5, · 1956, states as follows: "A review of the Commission's files indicates that during December, 1949 and December, 1950, WPTZ was licensed and operating with a visual ·effective radiated power of 16 kw at an antenna height of 720 feet

Even if we were to make such an assumption, this provision of the stipulation is too vague to be of service to Ettore, for the unusual atmospheric conditions which would permit the extension of a telecast are neither described nor specified. As to the telecasts by NBC in or near New York City, in the absence of some description which would enlarge their reach, we may not assume from the phrase "and elsewhere" that they penetrated any states outside of New York other than New Jersey.[6]

■ We find therefore in substance that the states in which Ettore asserts his rights were injured are Pennsylvania, Delaware, New Jersey, and New York. We must now look to Pennsylvania law with regard to the alleged injuries in Pennsylvania and, under the Pennsylvania conflict of laws rule, to the laws of Delaware and New Jersey as to the Pennsylvania telecasts and to the law of New York as to the New York telecasts, to determine what damage, if any, Ettore suffered in each of these jurisdictions. Moreover, since the NBC New York telecasts penetrated New Jersey,

we must look also to the law of New Jersey through the double lens of the Pennsylvania and New York conflict of laws rules to determine Ettore's injuries in New Jersey insofar as the defendant Chesebrough is concerned. This last determination will have little effect save as to the measure of damages, as we shall see.

With these preliminaries out of the way, we now come to the question, what kind of injury or injuries has Ettore suffered? Since the famous Warren and Brandeis article, "The Right to Privacy," 4 Harv.L.Rev. 193 (1890), a great deal has been published concerning the kind of action, if any, an individual in the position of Ettore in the instant case or in that of Leverton in our Leverton decision may maintain against one who has infringed his personal or property rights. The state of the law is still that of a haystack in a hurricane but certain words and phrases stick out. We read of the right of privacy, of invasion of property rights, of breach of contract, of equitable servitude, of unfair competition; and there are even suggestions of unjust enrichment.[7]

above average terrain. As computed in accordance with the Commission's present standards, the Grade A (68 dbu) field intensity contour of the station would have extended to an approximate average radius of 21 miles from the transmitter; the Grade B (47 dbu) contour would have extended 50 miles. It should be noted, however, that these computed distances indicate the approximate extent of coverage in the absence of interference from other television stations, and that under actual conditions, true coverage may vary greatly from these estimates because the terrain over any specific direction is expected to be different from the average terrain on which the above computations have been based."

The stipulation itself and the failure of Ettore to introduce any pertinent evidence as to range of the telecast seem to indicate an intent on his part to eliminate Maryland as a "point of impact," despite the very favorable aspects of the law of Maryland to his cause. See Norman v. Century Athletic Club, 1949, 193 Md. 584, 69 A.2d 466, 15 A.L.R.2d 777, discussed at a later point in this opinion.

6. We think we may take judicial notice of the fact that a telecast, in the absence of unusual atmospheric conditions, not proved here, cannot exceed the limitations suggested.

7. See the cases cited by Warren and Brandeis, in particular, Prince Albert v. Strange, 2 DeGex & Sm. 652, aff'd, 1 McN. & G. 25 (1849) (unauthorized reproduction of etchings made by Prince Albert and Queen Victoria for their own pleasure); Pollard v. Photographic Co., 40 Ch.Div. 345 (1888) (unauthorized sale of copies of plaintiff's photograph made under contract by defendant photographer); Woolsey v. Judd, 4 Duer 379, 404 (1855) (unauthorized publication of private letters); Abernethy v. Hutchinson, 3 L.J.Ch. 209 (1825) (unauthorized publication of professor's lectures by student).

A case decided by the Supreme Court of the United States presenting some analogy to that at bar is Manners v. Morosco, 1920, 252 U.S. 317, 326, 40 S. Ct. 335, 64 L.Ed. 590, the famous "Peg O' My Heart" decision. There the Court, by Mr. Justice Holmes, held that a theatrical producer could not represent a

For a long time judges were preoccupied with the question of whether there was any right of privacy or property of the kind asserted here which could be protected by the courts. However, as is pointed out by Prosser in his article, "Interstate Publication," 51 Mich.L.Rev. 959, 988-9 (1953), "By this time it has become quite clear that the answer is to be in the affirmative." In footnotes at the pages last cited, Prosser lists some twenty jurisdictions where the so-called right of privacy is accepted and an act such as that under consideration in the case at bar may be recognized as an independent tort. He points out that the right of privacy is less securely entrenched in nine other jurisdictions and that it is rejected in at least three, Rhode Island, Texas and Wisconsin. But if these decisions be read, we think the reader will conclude, as do we, that the word of *power*[8] most frequently employed by the courts is either "privacy" or "property," the latter usage being not infrequently colored by the contract rights of a performer or of an entrepreneur.

There are, speaking very generally, two polar types of cases. One arises when some accidental occurrence rends the veil of obscurity surrounding an average person and makes him, arguably, newsworthy. The other type involves the appropriation of the performance or production of a professional performer or entrepreneur. Between the two extremes are many gradations, most involving strictly commercial exploitation of some aspect of an individual's personality, such as his name or picture.[9]

An example of a case in the first category is our own Leverton [192 F.2d 975]. There the picture of a little girl being snatched from the path of an oncoming automobile was published in a magazine article on pedestrian carelessness entitled " 'They Asked To Be Killed.' " The caption under her picture spoke of children darting into traffic. This court, in allowing recovery, pointed out that the defendant's use of the picture had nothing to do with the plaintiff's narrow escape; for the motorist, not she, had

play in motion pictures when the express terms of his contract with the author did not authorize him to do so. In an article published in 41 Harv.L.Rev. 945 (1928) entitled "Equitable Servitudes on Chattels," Professor Chaffee advanced the theory that the principle of equitable servitude was applicable to personal and property rights of a sort not unlike those involved here. The Supreme Court of Pennsylvania in Waring v. WDAS Broadcasting Station, Inc., 1937, 327 Pa. 433, 194 A. 631, discussed *infra*, speaks of unfair competition. Unjust enrichment is referred to at a later point in this opinion.

8. Using the word "power" in its magical or talismanic sense.

9. See, e. g., Mau v. Rio Grande Oil, Inc., D.C.N.D.Cal.1939, 28 F.Supp. 845 (radio dramatization of holdup and shooting of plaintiff); Gill v. Curtis Pub. Co., 1952, 38 Cal.2d 273, 239 P.2d 630 (magazine picture of plaintiff in amorous pose); Kerby v. Hal Roach Studios, 1942, 53 Cal.App.2d 207, 127 P.2d 577 (plaintiff's name same as that of movie character who "signed" advertising letter which read like an invitation to an assignation); Melvin v. Reid, 1931, 112 Cal.App. 285, 297 P. 91 (early life of reformed prosti-

tute made subject of movie); Cason v. Baskin, 1944, 155 Fla. 198, 20 So.2d 243, 168 A.L.R. 430; Id., 1947, 159 Fla. 31, 30 So.2d 635 (plaintiff portrayed in defendant's autobiographical book "Cross Creek"); Bazemore v. Savannah Hospital, 1930, 171 Ga. 257, 155 S.E. 194 (picture of deformed child); Pavesich v. New England Life Ins. Co., 1905, 122 Ga. 190, 50 S.E. 68, 69 L.R.A. 101 (unauthorized use of plaintiff's picture and testimonial in insurance advertisement); Foster-Milburn Co. v. Chinn, 1909, 134 Ky. 424, 120 S.W. 364, 34 L.R.A.,N.S., 1137, (unauthorized testimonial for patent medicine); Barber v. Time, Inc., 1942, 348 Mo. 1199, 159 S.W.2d 291 (magazine picture of "starving glutton" in hospital bed); Redmond v. Columbia Pictures Corp., 1938, 277 N.Y. 707, 14 N.E.2d 636 (shots of professional golfer taken for newsreel with consent later used as part of short subject without consent); Binns v. Vitagraph Co., 1913, 210 N.Y. 51, 103 N.E. 1108, L.R.A.1915C, 839 (fictionalized film of plaintiff's heroic work as radio operator which resulted in saving passengers of sinking ship); Flake v. Greensboro News Co., 1938, 212 N.C. 780, 195 S.E. 55 (unauthorized use of plaintiff's picture in advertisements).

been at fault. In this type of case, by and large, the right invaded is a very personal one, really "the right to be let alone" described by Warren and Brandeis, and not a property right at all.

A typical case of the second type, relating to an entrepreneur and therefore indirectly to the performers working for him, or under his auspices, is Norman v. Century Athletic Club, 1949, 193 Md. 584, 69 A.2d 466, 469, 15 A.L.R.2d 777. There a syndicate leased the Baltimore Coliseum for the purpose of staging boxing bouts and contracted for broadcasting rights to the fights. When television became a commercial success, the lessee also sought to telecast the bouts. The Maryland Court of Appeals denied television broadcasting rights, stating, "The unambiguous words of this boxing contract cover radio and not television."

We think a distinction should be made —and, in fact, quite frequently has been made by courts—between the two types of cases. Where a professional performer is involved, there seems to be a recognition of a kind of property right in the performer to the product of his services. The theory may be summed up as follows: The performer, as a means of livelihood, contracts for his services with an entrepreneur. The finished product is, for example, a motion picture in which the performer's services are embodied. If the motion picture is employed for some use other than that for which it was intended by the performer and the entrepreneur, the motion picture is employed in such a way as to deprive the performer of his right to compensation for the new use of the product. It is usual today to provide specifically by contract between the performer and the entrepreneur as to what uses the product may be put; so, as to services performed and products made in the future, the issues presented by the case at bar will become largely academic. Today also, for example, if there be telecasts of an intercollegiate football game, the players, knowing or having reasonable grounds to know that the contest was being telecast, would be presumed to have waived any right to compensation for their performances by participating in the contest.

The defendants assert that Ettore has waived any property rights he may have. They contend that, by contracting for the sale of motion picture rights to his boxing contest, Ettore agreed in advance to any use, commercial or otherwise, to which the films could be put. There was no contractual limitation on use here, as there was in Weiss v. Hollywood Film Enterprises, 17 U.S. Law Week 2608 (Cal.Super.1949).

It is interesting to note that, broadly speaking, only two views are advanced as to motion pictures manufactured prior to the advent of commercial television. One view is that once a performer has contracted to appear in a motion picture production and has appeared, the film may be used without qualification for any purpose, provided that it is a fair presentation. Republic Pictures Corp. v. Rogers, 9 Cir., 1954, 213 F.2d 662; Autry v. Republic Productions, 9 Cir., 1954, 213 F.2d 667; Wexley v. KTTV, D.C.S.D.Cal.1952, 108 F.Supp. 558, affirmed 9 Cir., 1955, 220 F.2d 438. See also Hollywood Plays v. Columbia Pictures Corp., Sup.Ct.1947, 77 N.Y.S.2d 568, 576, reversed on other grounds, 1949, 299 N.Y. 61, 85 N.E.2d 865, 10 A.L.R.2d 722. The other view is that the film may not be used for a purpose not contemplated at the time of its creation. See Sharkey v. National Broadcasting Co., Inc., D.C.S.D.N.Y. 1950, 93 F.Supp. 986, 987 and Weiss v. Hollywood Film Enterprises, supra.

 This brings us to the substantial issue which underlies these two divergent views. Is telecasting a motion picture an essentially different use than that to which the film would be put if shown in motion picture houses? We think that both this court and the court below may take judicial notice of the fact that there are more than 17 million television sets in use in the United States today. See Silverberg, "Televising Old Films," 38 Va.L.Rev.

615 (1952). Judicial notice may also be taken of the fact that more and more old films, films made prior to commercial television—some, indeed, made at a time when television itself was but little more than a gleam in the inventors' eyes—are being and will be telecast. See the articles in the New York Times, Sunday, July 24, 1955, p. 49, "More Films for Video," and in the Philadelphia Inquirer, Wednesday, July 25, 1955, p. 22, "Films Makers Offered Chance to Help Status." Both articles stress the enormous use of films for television programs, and the latter article states that Metro-Goldwyn-Mayer " * * * is expected to draw on a rich mine of more than 1,000 short subjects made in the past."

It must be conceded that television is a new medium for the presentation of motion pictures. Ordinarily a motion picture film is projected by a projector by rays of light cast on a screen. There is no direct interposition of electrical energy. But when a film is telecast, there is the interposition of electric impulses which carry the picture to receiving sets where it is reproduced by rays of light for the eyes of the spectator. It may be fairly said, we think, that this is a new use of the film and one which was not in commercial existence at the time Ettore made his contract.

Should a man be deemed to have granted a use, not in existence and not contemplated by either party, at the time the contract of sale was made? Some examples come readily to mind. A man sells a farm which five years later becomes a valuable real estate development because of an expanding city. Surely the seller of the farm could not rescind the contract, nor would a court award him additional compensation. But in Manners v. Morosco, 1920, 252 U.S. 317, 40 S.Ct. 335, 336, 64 L.Ed. 590, the Supreme Court by Mr. Justice Holmes, held that the author, Manners, who had granted the producer, Morosco, a "sole and exclusive license and liberty to produce, perform and represent" Manners' play, "Peg O' My Heart", in the United States and Canada, did not thereby grant to Morosco the right to reproduce the play in motion pictures. In the Manners case, however, it should be borne in mind that the context of the contract made it reasonably clear that stage productions only were contemplated by the parties to the contract. In the Manners case motion pictures were, of course, in use commercially at the time of the execution of the contract, 1912, albeit the use was in a somewhat primitive state. In Norman v. Century Athletic Club, supra, the lease was executed in 1943; and there can be no doubt that commercial television was in use in that year. In both Manners and Norman the question was whether the words of the contracts embraced the new or additional media, and it was decided that they did not. The contrary view, that of complete alienation, was originally expressed by the Court of Appeals for the Second Circuit in RCA Mfg. Co. v. Whiteman, 114 F. 2d 86, certiorari denied, 1940, 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463, Judge Learned Hand stating that there could be no partial alienation of the artistic product involved, that if records were made for sale and were sold, the artist lost every right in, and all control over, the product. We point out now, in connection with the law of Pennsylvania, to be discussed hereinafter, that the agreement between Whiteman and RCA specifically provided that the records should not be used for broadcasting purposes. Cf. Chavez v. Hollywood Post, 16 U.S.Law Week 2362 (Cal.Super. 1948). The Whiteman case, however, was expressly overruled some fifteen years later by Capitol Records, Inc., v. Mercury Records Corporation, 2 Cir., 1955, 221 F.2d 657, 663, citing Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y. S.2d 483; Id., 279 App.Div. 632, 107 N.Y.S.2d 795. The Metropolitan Opera Ass'n case went off on the ground of unfair competition.

After this prelude on the state of the law in general, we come now to the four

states in which Ettore claims he sustained damage. These are possible "points of impact," [10] i. e., the points at which the tortious acts of the defendants impinged upon the rights of Ettore. If damage was done to a property right of Ettore's, his right to contract or sell his performance for television, that right might have been damaged in each of the four states named. But if the damage was to his personality by way of an invasion of his right of privacy, there is another possible view as to the point or points of impact. In Bernstein v. National Broadcasting Co., D.C.D.C.1955, 129 F.Supp. 817, 825, it was alleged that Bernstein's right of privacy had been invaded, the asserted invasion consisting of a fictionalized dramatization of his life. He had been convicted of murder and subsequently pardoned. Construing Section 8–650, Virginia Code 1950, Vol. 2, the court stated that the injury, if a tort at all, was a tort upon Bernstein's person.[11] Quoting with approval from Reed v. Real Detective Publishing Co., 1945, 63 Ariz. 294, 305–306, 162 P.2d 133, 139, holding that where there is an invasion of the right of privacy "for injured feelings alone," the wrong must be considered as a direct rather than an indirect injury, the court said: "It seems to us that the mind of an individual, his feelings and mental processes, are as much a part of his person as his observable physical members." The court held that the injury necessarily occurred where Bernstein was, or at least where he lived. If this ruling were applied to the case at bar, Ettore necessarily would have to be considered as having sustained injury only in Pennsylvania since he lives there.

It is unnecessary to pass on the correctness of this proposition. In all four of the states where Ettore asserts that he has been injured, the right protected is one of property. We shall deal with Pennsylvania first. There the talismanic word is "property" rather than "privacy", though Pennsylvania judges have used both. The leading case is Waring v. WDAS Broadcasting Station, Inc., 1937, 327 Pa. 433, 194 A. 631, 638. In that case the Supreme Court of Pennsylvania held that Waring was entitled to an injunction to prevent WDAS from broadcasting music from phonograph records made by Waring's orchestra for RCA for a fee and purchased by WDAS from RCA. The records had printed on them a legend, "Not licensed for Radio Broadcast." Cf. RCA Mfg. Co. v. Whiteman, and Capitol Records, Inc., v. Mercury Records Corporation, supra. Mr. (now Chief) Justice Stern, spoke of "[Waring's] common-law rights of property in his orchestra's renditions", and also of unfair competition. Mr. Justice Stern seems to have based his opinion sustaining Waring's claim on damage to Waring's property right by way of unfair competition. Mr. Justice Linn concurred on the ground of unfair competition. Mr. (later Chief) Justice Maxey concurred on the ground that Waring's right of privacy had been invaded. It would seem therefore that the Court's decision really went off on the ground of unfair competition damaging a property right. In other words, in the Waring case the Court found a property right and proceeded to protect it.[12]

---

10. The phrase is borrowed from Prosser's article, 51 Mich.L.Rev. at p. 971 ff., and compare Hartmann v. Time, Inc., 3 Cir., 1948, 166 F.2d 127.

11. Bernstein also alleged a common-law right of privacy. The court denied recovery on this ground for reasons not pertinent here, citing Elmhurst v. Shoreham Hotel, D.C.D.C.1945, 58 F.Supp. 484, affirmed sub nomine Elmhurst v. Pearson, 1946, 80 U.S.App.D.C. 372, 153 F.2d 407.

12. Defendants urge that the Supreme Court of Pennsylvania has declared that television and motion picture exhibitions are the same thing, citing Philadelphia Retail Liquor Dealers Ass'n v. Pennsylvania Liquor Control Board, 1948, 360 Pa. 269, 62 A.2d 53, 55, 4 A.L.R.2d 1212. As we read this decision, the Court did not hold them to be the same, but, construing the Pennsylvania Liquor Control Act, 47 P.S. Pa. §§ 744–602(14), decided that screen exhibitions by means

We think that the Supreme Court of Pennsylvania found that Waring had a right to control the production of his own music, and that this was a property right. Perhaps some light is thrown on what was meant by an examination of Heasley v. Operative Plasterers, etc., Ass'n, Local No. 31, 1936, 324 Pa. 257, 188 A. 206, 207, where the Supreme Court of Pennsylvania sanctioned the use of an injunction to restore membership to ousted officers of a union. Mr. Justice Stern said: "The right to contract for work is one of the most important of property rights, and therefore the power of a court of equity may properly be invoked to restrain its impairment."

Decisions granting injunctions in unfair competition cases usually are based on the passing or palming off of one's own goods as those of another, plainly an invasion of a property right and a business tort. The doctrine of unfair competition, however, has not been limited to the palming off of goods but has long been extended in order to grant relief where there has been no fraud on the public but a misappropriation for the commercial advantage of one person of a benefit or a property right belonging to another. Such an extension of the doctrine of unfair competition was made in the Waring case. It can be argued, of course, that listeners to the WDAS broadcast of Waring records might have believed that they were listening to Waring "live" and not to his records and that therefore there was a kind of palming off; but no such idea was suggested by any of the Justices' opinions in Waring. If it be pertinent here, it is clear that no one, except perhaps the most naïve, could have believed that the Ettore-Louis telecasts were "live."

■ We think that, if the case at bar were brought before the Supreme Court of Pennsylvania, that Court would probably hold that Ettore's right to control the production of his boxing performance, involving the right to control the scope or reach of his own services, had been impaired by the defendants and consequently would grant damages on the theory of unfair competition constituting injury to a property right. Concededly, the theory is a somewhat hazy one; but that is not unusual where the laboratories of the courts are working out the development of a new common law right. History shows that consistency is a rare jewel in such a process. The development of the theories of venue, of the action on the case and the action of ejectment are classic examples.

But we must concede also that we are troubled by two other factors. The first is that Ettore is not such an artist as the Supreme Court of Pennsylvania described Waring to be, at least by inference, and that Court might therefore be more hesitant to exercise principles of equity on his behalf. But we do not think that the quality of the performance can supply the criterion. The fact is that, if a performer performs for hire, a curtailment, without consideration, of his right to control his performance is a wrong to him. Such a wrong vitally affects his livelihood, precisely as a trade libel, for example, affects the earnings of a corporation. If the artistry of the performance be used as a criterion, every judge perforce must turn himself into a literary, theatrical or sports critic.

The second additional factor that troubles us is that Ettore did not expressly reserve rights against the televising of the films by any legend on the films or, insofar as it appears, by his contract.[13] As will be seen from Mr. Justice Stern's opinion, he at least, the other Justices making no statement respecting this fact, referred twice to the restrictive legend on the records "Not licensed for Radio Broadcast." The learned Justice, however, did not treat the restrictive legend

of television in a tavern constitute one of the types of entertainment, like "moving picture exhibitions", for which a special amusement permit is required.

13. Neither we nor the court below had Ettore's contract before us, and its absence is unexplained.

491

as a factor operating altogether in Waring's favor. He said that the restriction was not unreasonable and did not operate "in restraint of trade"; that it was intended for a legitimate purpose and permitted "distinguished musicians to commit their renditions to phonograph records—except possibly for a prohibitive financial compensation—without subjecting themselves to the disadvantages and losses which they would inevitably suffer from the use of the records for broadcasting"; that such a restriction therefore worked for the benefit of art and artists. See 327 Pa. at pages 436, 447, 194 A. at pages 633, 638. Radio broadcasting was rather well established at the time when Waring made his records. Commercial television, as we have stated, was not in existence at the time of the Ettore-Louis contest. Fairness would seem to require that a court treat the absence of the new or unknown media, television in the instant case, as about the equivalent of a reservation against the use of the work product of the artist or performer by a known medium, radio broadcasting in Waring's case.[14]

The rule of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, requires us to divine as well as we can the result which the Supreme Court of Pennsylvania would reach in the instant case by taking into consideration all factors and indicia in our endeavor to arrive at the result which that tribunal would reach. It is a ferocious task in the instant case, but we think that the Supreme Court of Pennsylvania would grant Ettore a right of action under the circumstances at bar.

■ As to Ettore's rights under the law of New Jersey, we find that the courts of New Jersey look toward the protection of a right of privacy and toward the protection of a right of property as well, as the circumstances require. As examples of cases looking to the protection of a right of privacy, we cite McGovern v. Van Riper, 1945, 137 N.J.Eq. 24, 43 A.2d 514, where distribution of an accused's fingerprints and photograph to law enforcement agencies prior to his conviction was enjoined, and Frey v. Dixon, 1948, 141 N.J.Eq. 481, 58 A.2d 86, which involved the employment of subpoenas duces tecum of too broad scope. See also Vanderbilt v. Mitchell, 1907, 72 N.J.Eq. 910, 919, 67 A. 97, 100, 14 L.R.A.,N.S., 304. In that case the court, albeit by way of dictum, stated that a false entry upon the public birth records that the complainant was the father of a child would constitute an infringement of personal rights. However, in Edison v. Edison Polyform & Mfg. Co., 1907, 73 N.J.Eq. 136, 67 A. 392, where Thomas A. Edison brought suit to restrain the use of his name in defendant's corporate title and the use of his picture and purported testimonial on its patent medicine bottles, and in advertising its product, the Court of Chancery of New Jersey seemed to base its injunction primarily on the ground that it was protecting a property right, viz., Edison's name. In the Edison case the Court expressly did not base the relief granted to Edison on the theory of unfair competition. We are of the view that, in respect to the facts of the instant case, the New Jersey Supreme Court would probably take the view expressed

14. Some light on the question of whether Ettore's mind should have adverted to the films of his contest with Louis being employed in commercial telecasts is thrown by a statement made by Roger Burlingame in Engines of Democracy, Charles Scribner's Sons, 1940, p. 460. Mr. Burlingame stated: "The invention [television] is nearly as old as radio, yet almost twenty years after radio became a commonplace in America, television is still, largely, in an experimental stage as far as society is concerned. For many years after the technology was perfected, the questions 'What is it for?' and 'Who wants it?' have prevented its entrance into commerce. In this respect it is one of the most curious phenomena in the history of invention. In respect to social effect its influence, to date, is nil."

It would be obviously unfair to state that Ettore's mind should have adverted to a possible commercial telecast of the films in 1936 when the Ettore-Louis contest was held.

by the Court of Chancery in the Edison case but would grant damages in lieu of an injunction.

█ As to Delaware, we have found no case and none has been cited to us dealing specifically with the right of privacy. An analogy may perhaps be suggested by the Delaware treatment of libel and slander which are deemed personal injuries and protected as such if the circumstances resembled, let us say, those of Vanderbilt v. Mitchell; MacDonough v. A. S. Beck Shoe Corp., Del. Super.1939, 1 Terry 318, 10 A.2d 510, Rice v. Simmons, Del.1838, 2 Har. 417. But Delaware recognizes a property right in a corporation's name. E. g., Standard Oilshares v. Standard Oil Group, 1930, 17 Del.Ch. 113, 150 A. 174. And the doctrine of trade libel is also applicable in Delaware, and this, too, involves a property right. See Black & Yates v. Mahogany Ass'n, 3 Cir., 1942, 129 F.2d 227, 232, 148 A.L.R. 841. Cf. J. C. Pitman & Sons v. Pitman, 1946, 29 Del.Ch. 189, 47 A.2d 721. It should be noted that the Delaware courts frequently look to Pennsylvania and New Jersey decisions when pertinent authorities are lacking in their own jurisdiction. We are of the view that the courts of Delaware would follow the principles enunciated by the Supreme Court of Pennsylvania in the Waring case or the Court of Chancery of New Jersey in the Edison case and grant Ettore a cause of action.

So much for three of the four states. The fourth is New York. The law of New York presents difficulties. In Roberson v. Rochester Folding-Box Co., 1902, 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478, the Court of Appeals of New York held that there was no right of privacy cognizable at common law. Subsequently Section 51 of the New York Civil Rights Law, McK.Consol.Laws, c. 6, was passed. Section 51 provides: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without [such person's] * * * written consent * * * may * * * sue and recover damages for any injuries sustained by reason of

such use." The scope of the New York statute is described in Redmond v. Columbia Pictures Corp., 1938, 277 N.Y. 707, 14 N.E.2d 636. In Sidis v. F-R Pub. Corporation, 2 Cir., 1940, 113 F.2d 806, 810, 138 A.L.R. 15, the Second Circuit found no violation of Section 51 in a merciless but unvarnished and unfictionalized account in the New Yorker magazine of the dreary middle age of an infant prodigy on the ground that his earlier fame made his later life a subject of legitimate public interest. Likewise, the Court held that the New Yorker's advertisements featuring the Sidis story shared "the privilege enjoyed by the article", citing Humiston v. Universal Film Manufacturing Co., 1919, 189 App.Div. 467, 178 N.Y.S. 752.

In the more recent case of Gautier v. Pro-Football, Inc., 1952, 304 N.Y. 354, 107 N.E.2d 485, 487, the Court of Appeals of New York stated that the right of privacy was a creature of statute and "was born of the need to protect the individual from selfish, commercial exploitation of his personality." Gautier, an animal trainer, had performed before a large audience in Griffith Stadium in Washington between the halves of a professional football game. His contract provided that his act should not be televised without the written permission of the American Guild of Variety Artists. In spite of the fact that such consent had not been obtained, Gautier's performance was telecast along with the football game. Although the telecast was paid for by Liggett & Myers Tobacco Company, soliciting the sale of cigarettes, the Court of Appeals pointed out that the entire program was not thereby constituted a solicitation of patronage. The Court stated that, unless Gautier's name or picture were in some way incorporated into the "commercial," the fact of sponsorship of the telecast would not of itself suffice to violate the statute. The Court went on to say that Gautier was not connected with the product "either by visual, oral or other reference" and that there was therefore no use of his name or picture for advertising purposes or

for purposes of trade within the meaning of Section 51.

The rule laid down by the Court of Appeals of New York is a narrow one. It is probable that this restricted construction results from the fact that the New York "right of privacy" statute also includes a criminal section. The companion Section 50 of the Civil Rights Law creates a misdemeanor and, because of its criminal nature, must be strictly construed. This appears to have resulted in a similarly narrow interpretation of the civil section. The Gautier decision would require, in order to authorize recovery by Ettore under Section 51, that his name or picture actually be a part of the "commercial" itself. An examination of the words accompanying the telecast of the fight movies demonstrates that neither Ettore's name nor any picture of him was thus connected.

The New York Court of Appeals indicated that Gautier might have had some other cause of action which he did not assert. The cause of action which the Court of Appeals may have had in mind may well have been one for unfair competition.

Whether a cause of action based on unfair competition can be sustained in the suit at bar depends on whether Sections 50 and 51 of the New York Civil Rights Law must be deemed to be preemptive and to supply the exclusive remedy.[15] The two films telecast by NBC from New York City caused hundreds of thousands of pictuers of Ettore to appear on television screens in the State of New York. These reproductions, if the pertinent sections of the New York Civil Rights Law

be construed literally, would fall within the literal language of the statute and would prohibit Ettore from maintaining any cause of action based on unfair competition. But the cause of action created by the New York Civil Rights Law was intended to protect the individual's right in his own personality, to protect a personal as distinguished from a property right. A cause of action based on unfair competition is supportable under the common law of New York.

■ We think it is reasonably clear that the law of New York under the circumstances at bar does give Ettore a cause of action based on unfair competition. We arrive at this conclusion by analogizing the facts of the instant case to those of Capitol Records, Inc., v. Mercury Records Corporation, 2 Cir., 1955, 221 F.2d 657, and Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483; Id., 279 App.Div. 632, 107 N.Y.S.2d 795. The rights of two rival companies to manufacture and sell in the United States records manufactured from certain matrices were adjudicated and rights of artists and performers were not involved in the Capitol Records case, as were those of Waring in Waring v. WDAS Broadcasting Station, Inc., supra. Nonetheless, Judge Dimock, writing for the majority, and Judge Learned Hand, dissenting, seem to suggest, however implicitly, that if the performers' rights had not been yielded totally by them, the exploitation of their performances by reproductions without further compensation would have been enjoined or prohibited under the guise of protection from unfair competition.[16] The same conclusion seems

15. Section 50 provides: "A person, firm or corporation that uses for advertising purposes, or for the *purposes of trade*, the name, portrait or *picture of* any living person without having first obtained the written consent of such person * * * is guilty of a misdemeanor." (Emphasis added.)

16. The Court of Appeals for the Second Circuit considered the law of New York as determinative of the issue of which party had the right to use the matrices,

citing Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. See 221 F.2d at page 662. The Court of Appeals, however, on the theory that the New York law was applicable, citing the English leading case of Celementi v. Walker, 2 Barnewall & Cresswell 861, refused a fine romp through the laws of various European countries, the kind of excursion which this court is compelled to make through the laws of the States by virtue of Erie R. Co. v. Tompkins and Klaxon Co. v. Stentor Electric Mfg.

implicit also in the Metropolitan Opera Association case. We conclude, therefore, that under the law of New York Ettore has a cause of action for unfair competition under the circumstances at bar. But since NBC is not named as a party in the instant suit, such damages as Ettore may be able to prove arising out of NBC's telecasts in New York can go only against Chesebrough.

But another phase of the telecasts in New York also requires consideration. There can be no doubt that the New York telecast by NBC penetrated New Jersey just as did the Pennsylvania telecast by Philco. The stipulation seems to require the inference that the Pennsylvania and New York telecasts occurred at the same instants in time. Did not causes of action cognizable under the conflict of laws rules of New York and enforceable in Pennsylvania under the conflict of laws rules of that state arise in favor of Ettore because of the penetration of the New York telecasts into New Jersey? We think that the answer must be in the affirmative under Klaxon Co. v. Stentor Electric Mfg. Co. Theoretically, at least, Ettore's property rights were four times violated in New Jersey: twice by the Pennsylvania WPTZ telecasts and twice by the New York NBC telecasts. But the NBC telecasts penetrating New Jersey go only against the defendant Chesebrough, NBC not being named as a party, and not against the defendant Philco. We shall deal with these causes of action in relation to the Pennsylvania suit at bar at a later point in this opinion.

WPTZ telecast the films twice, once on December 30, 1949, and again on December 8, 1950. As we have said, NBC effected similar telecasts from New York. To employ an analogy from the law of libel and slander, there were two sets of publications, quite far apart in time. All the telecasts were identical in pictures and sounds, but each set created a right of action in Ettore, and he is entitled to damages by reason of each single set of telecasts. See Hartmann v. Time, Inc., supra. So much we consider to be reasonably plain.

In the Hartmann case we inquired: "What is the Pennsylvania conflict-of-laws rule when publication of defamatory material takes place both within and without the State of Pennsylvania?", citing Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. And we in Hartmann, 166 F.2d at page 134, treating with libel, held that Pennsylvania would follow the so-called "single publication" rule as to Pennsylvania; but the Pennsylvania courts will refer, as we indicated earlier, the respective foreign publications to the appropriate foreign laws. See Bayuk Bros. v. Wilson Martin Co., 1923, 81 Pa. Super. 195, and Sudol v. Gorga, 1943, 346 Pa. 463, 465, 31 A.2d 119, 120. See also Klumph v. Dunn, 1870, 66 Pa. 141, 146, 5 Am.Rep. 355.

The issue as to both Philco and Chesebrough and the Pennsylvania Philco telecasts is this: Does the Pennsylvania single publication rule, which we think is as applicable in this case as it was in the Hartmann case, engross, as it were, the telecasts in New Jersey and Delaware involving both the defendant Philco and the defendant Chesebrough? This seems to depend on whether or not New Jersey and Delaware in their turn follow the single publication rule. If both of these states do follow the single publication rule, there can be no separation of the causes of action arising in New Jersey and Delaware as distinguished from that arising in Pennsylvania. Since it is the conflict of laws rule of Pennsylvania to refer such issues to the law of the forum

Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477.
It is also of great interest to note that Judge Learned Hand's dissent contains the suggestion that because the field was one which has been preempted by the Federal Copyright Act, 17 U.S.C. §

1 et seq., there may a body of general federal law under which the ownership of the matrices and the right to produce and sell the records could be decided. The ghost of Swift v. Tyson, [16 Pet. 1, 41 U.S. 1, 10 L.Ed. 865] tunes again his lyre.

in which the injury occurred, we must look again to the laws of New Jersey and Delaware to determine whether or not they follow the single publication doctrine.

█ Insofar as we are aware, no New Jersey case has decided this issue even as to libel or slander, and we can find no technical trace of any New Jersey law pertinent to the issue of the invasion of a property right as asserted by Ettore here. The same must be said of the law of Delaware. We conclude, however, that the Delaware courts and probably the New Jersey courts would follow the Pennsylvania rule. Certainly it is the logical one and is recommended by public policy, having due regard for freedom of speech, of the press and of television. This means that Ettore is entitled to collect damages only once from the defendant Philco for each of the two telecasts emanating from WPTZ in Philadelphia on the causes of action ensuing therefrom. He may show by way of elements of damage, nonetheless, that A in Milford, Delaware, or B in Trenton, New Jersey, saw and heard the telecasts; but he can maintain no separate Delaware or New Jersey causes of action in the court below by reason of the WPTZ telecasts.

█ As to the defendant Chesebrough and the NBC telecasts emanating in and from New York, seen and heard by C in New York, neither Philco nor NBC being liable therefor under the pleadings and circumstances of the instant case, New York clearly has the single publication rule, as was stated in Hartmann v. Time, Inc., 166 F.2d at page 134. Since the New York telecasts and the Pennsylvania telecasts took place at the same times and New York employs the single publication rule, logic seems to require the conclusion that any cause of action arising against Chesebrough in New York and New Jersey by reason of the NBC telecasts from New York would be engrossed by the present Pennsylvania suit. But the issue of measure of damages, insofar as Chesebrough is concerned, remains for disposition. The New York NBC telecasts seen and heard in New York, also were seen and heard in the northern part of New Jersey as compared to the WPTZ telecasts which may have been viewed only in the southern part of New Jersey. If Ettore is able to prove that the telecasts were seen and heard in New York and by persons in the northern part of New Jersey who did not view the Philco Pennsylvania telecasts, by reason of the physical limitations imposed on television, he might be able to assert additional elements of damage. How he would be able to present such proof is another problem. There may be some analogy between the circumstances at bar and those presented by such cases as Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, the cases cited therein, the dissenting opinion in the Circuit Court of Appeals, 1 Cir., 1930, 37 F.2d 537, 541, reversed on appeal, the cases cited therein and the Annotation, 78 A.L.R. 858. As to this we express no opinion. This and similar questions must be left to the trial court upon remand.[17]

In conclusion on this subject, we regret the necessity of having to deal piecemeal with the problems at bar, State by State, facet by facet, detail by detail. We think we are compelled to such a course by the decisions in Erie R. Co. v. Tompkins and Klaxon Co. v. Stentor Electric Mfg. Co. The courts of the United States in a diversity case must apply the laws of the respective states. No single body of law is available.

One final issue requires brief consideration. Ettore insists that the telecasts of the boxing contest, were unfair to him because the third round, "his best round," was omitted. This might have afforded a cause of action to Ettore. Compare Mau v. Rio Grande Oil, Inc.; Redmond v. Columbia Pictures Corp.; Binns v. Vitagraph Co., all supra note 9.

---

17. The stipulation provides, par. 17: "It is agreed that the question of damages is not included in this stipulation and is reserved until after the ruling of the Court. * * *"

See also Sutton v. Hearst Corp., 1st Dept. 1950, 277 App.Div. 155, 98 N.Y.S.2d 233. But the remarks of the narrator as they appear from the stipulation were surely harmless, and the telecast was not embellished or truncated in any way substantially unfavorable to Ettore. The telecast was merely condensed to meet the time requirements ordained by the sponsor, the defendant Chesebrough. A viewing of the films compels us to the conclusion that, were the case to go off on the issue of the alleged unfairness of the telecasts to Ettore's prowess as a boxer or skill as a performer, we would hold that the omissions were *de minimis*. Cf. Cohen v. Marx, 1949, 94 Cal.App.2d 704, 211 P.2d 320.

The judgment of the court below will be reversed and the case will be remanded with directions to reconsider the issues presented in the light of this opinion, to make findings of fact and conclusions of law, and to ascertain the amount of damages, if any, that Ettore has suffered.

HASTIE, Circuit Judge (dissenting).

Plaintiff Ettore, a professional boxer, fought Joe Louis in a Philadelphia stadium in 1936. With Ettore's knowledge and consent this public spectacle was recorded on motion picture film by a third person in his own interest for subsequent commercial showings. Ettore bargained for and received for his services compensation which included "a 20 per cent percentage (sic) of all proceeds derived from motion picture rights." The parties have stipulated that the motion picture rights were sold for $2500, of which $500 was paid to Ettore.

More than 13 years later the defendants exhibited these films by telecast from stations in Pennsylvania and New York. Invoking the diversity jurisdiction of the District Court for the Eastern District of Pennsylvania, Ettore has sued the defendants claiming that these television showings have damaged him in an amount more than $3000.

This action does not sound in contract. Apparently the defendants had no connection with the 1936 fight and are not in contractual relationship with Ettore. In any event, no breach of contract is alleged.

Plaintiff does claim a violation of his right of privacy. However, I think the court is clearly correct in concluding that this theory of liability fails. The right of privacy is a partially protected interest of personality. Its modern recognition is an effort to protect the individual against offense to his sensibilities caused by some unwanted and unwarranted publication of his likeness or activity. As a participant in a professional prize fight Ettore was seeking as large an audience for his performance as promotional skill could attract to ringside and to the theaters where the fight films were subsequently exhibited. The addition of a television audience cannot rationally be regarded as making the publication offensive to the performer.

I also agree that plaintiff's contention that his privacy was invaded is not improved by the fact that less than the entire spectacle was shown on television.

Entirely different considerations are raised by plaintiff's additional claim that he has been deprived of some valuable property right. However, I think he cannot prevail on this theory either.

It is clear and not disputed that the person who made the movies of the Louis-Ettore fight, having bargained and paid for that privilege, had legal title to that article of commerce which is the film recording of the spectacle. But, as I understand the theory that has prevailed here, it is reasoned that there remained in each athlete whose professional performance gave the film its value a property right in the nature of a legal power to restrict the use of the recorded spectacle.

In such fields as literature, music and the graphic and dramatic arts, our judge made law has long recognized and to some extent protected an economic interest of the artist in that composition or performance which is the embodiment or expression of his special ability. This interest is vindicated by empowering the

performer to exercise some degree of control over the publication and use of the product in question. This conception inheres in such legal phrases as literary property and common law copyright. Whether this property analysis should be extended into the field of sport to afford a professional performer there a sort of athletic property in the spectacle produced by his exhibition of physical strength, stamina and skill I am by no means sure. And on this point I do not find the cases helpful. However, beyond this caveat, I take no issue now with the court's conclusion that the conception of an artist enjoying an incorporeal property in his performance should be extended to protect the professional athlete in relation to the sport spectacle he helps to produce.

But the legal protection of common law copyright and literary property has rather consistently been limited by a closely related conception that the showing or rendition of a production or composition may and often does amount to a dedication to the public which is inconsistent with and destructive of any property the artist or performer might otherwise retain in the product of his talent and skill.[1] If disclosure is to all who may be interested rather than to a limited audience on a special occasion, the publication is said to be general and the consequent dedication of the artist's creation or effort is unqualified. Applied to a professional athlete's possible property in his demonstration of skill and ability, this concept precludes him from both retaining property in a particular exhibition and at the same time consenting that the spectacle be seen and heard by all and sundry.

We have just such a situation here. Ettore did more than to make his performance available to as many persons as could be accommodated at the site of the boxing match. He also made it available through motion pictures to all who would come to view it in theaters throughout the country. For all practical purposes the matter was so arranged that whoever might wish and attempt to see the spectacle could view it originally or at later convenience. I find it difficult to conceive of a performance under circumstances which would more clearly show general publication and consequent dedication. Cf. Glazer v. Hoffman, 1943, 153 Fla. 809, 16 So.2d 53.

Such extinction of the participant's claim as performer does not mean that any authorized commercial recording of the performance must be denied legal protection. In the era of the phonograph, radio and television, master films and sound recordings of artistic and other professional performances have become articles of great commercial value and importance. Courts are attempting to adapt flexible concepts of unfair competition to protect the owner of such an authorized recording in his commercial exploitation of that property against commercial recording and similar unfair and injurious practices, despite the publication inevitably involved in the owner's exploitation of his recording. Capitol Records, Inc., v. Mercury Record Corp., 2 Cir., 1955, 221 F.2d 657. But if the performer shares in such protection it is not because he is a performer but rather because he has contracted for some interest in the recording or at least, in authorizing it, has imposed some restriction upon its use. This, as I understand it, is the significance of the decision of the Supreme Court of Pennsylvania in Waring v. WDAS Broadcasting Station, Inc., 1937, 327 Pa. 433, 194 A. 631. There a musical organization had released recordings of its performance for public distribution and sale, but this was attended by an express reservation and restriction against radio broadcasting. This restriction was set out in

---

1. For elaboration of this doctrine and commentary on the cases, see Werckmeister v. American Lithographic Co., 2 Cir., 1904, 134 F. 321, 68 L.R.A. 591; Warner, Protection of the Content of Radio and Television Programs by Common Law Copyright, 1950, 3 Vand.L. Rev. 209, 225-231.

writing on the face of each released record. In these circumstances the Supreme Court of Pennsylvania found that the musicians were entitled to protection coextensive with this express reservation. Cf. Murphy v. Christian Press Ass'n, Pub. Co., 1899, 38 App.Div. 426, 56 N.Y.S. 597. In Waring I find no intimation that, apart from such reservation, any performer's property in the musical rendition would have survived an authorized general publication of a commercial recording. Cf. Ingram v. Bowers, 2 Cir., 1932, 57 F.2d 65; Noble v. One Sixty Commonwealth Ave., Inc., D. C.D.Mass.1937, 19 F.Supp. 671.

In the present case the court recognizes this difficulty. In consenting to the sale of motion picture rights for the fight Ettore made no effort to impose any restriction upon the use of the film. I think the court is mistaken in reasoning that, because television did not exist at that time, the law should treat "the absence of the new or unknown media * * * as about the equivalent of a reservation against the use of the work product * * *." The error as I see it is in failing to take into account that at least some demonstration of purpose to hold something back is necessary to avoid the dedication which otherwise attends the general publication of the work product. In this case the fact that in 1936 motion picture projection was the only means available for public exhibition of fight films serves to emphasize the fact that Ettore published and dedicated the spectacle as completely as he knew how. This in my view is the very antithesis of the Waring situation.

I conclude, therefore, that Ettore retained no property in the pugilistic spectacle or its recording on film. In reaching this conclusion I have not said anythink about the problem of choice of controlling law which is discussed at length in the opinion of the court. However, I think that we all agree that, of the states concerned with this alleged deprivation of property, Pennsylvania, because of the Waring case, seems as favorable as any other to the plaintiff.[2] But, for the reasons already stated, I think the Waring case does not help the plaintiff, and I find no other decision in Pennsylvania or New York, the two points of origin of the questioned telecasts, which either helps the plaintiff or is inconsistent with the foregoing analysis of the problem.

Finally, I think this is not a type of case in which a federal court should be disposed to extend undefined frontiers of state law. Legal title to personal property, here some old fight films, normally connotes full power of commercial use and exploitation. Indeed, a rather strong public policy against legal recognition of attempts to burden chattels with equitable servitudes has characterized the development of our jurisprudence. See Chafee, "Equitable Servitudes on Chattels," 1928, 41 Harv.L.Rev. 945. Here I think the court is going to the opposite extreme and imposing such a servitude by implication of law even in the absence of any effort of the party concerned to reserve such an interest.

For these reasons I think the judgment of the district court should be affirmed.

2. Relying upon decisions of New York inferior courts, the Court of Appeals for the Second Circuit has concluded that New York law is in accord with the Waring case. Capitol Records, Inc., v. Mercury Record Corp., 1955, 221 F.2d 657.